```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: March 26, 2013
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AMERICAN STEAMSHIP OWNERS
MUTUAL PROTECTION AND
INDEMNITY ASSOCIATION, INC.,

        Plaintiff,

  - against -

MARK J. HENDERSON,

        Defendant.

**MEMORANDUM**
**OPINION & ORDER**

10 Civ. 8033 (PGG)

MARK J. HENDERSON,

        Plaintiff,

  - against -

AMERICAN STEAMSHIP OWNERS
MUTUAL PROTECTION AND
INDEMNITY ASSOCIATION, INC.,

        Defendant.

11 Civ. 3869 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

    In these consolidated actions, seaman Mark J. Henderson claims that American Steamship Owners Mutual Protection and Indemnity Association, Inc. (the "Association") is obligated to satisfy a judgment he obtained against Atlantic Pelagic Seafood, LLC ("Atlantic"). The Association has moved for an order declaring that New York law governs these actions. For the reasons stated below, the Association's motion will be granted.

**BACKGROUND**[1]

I.     **FACTUAL BACKGROUND**

The Association is a non-profit mutual insurance organization that offers insurance to its vessel-owning members against third-party liabilities arising from the ownership and operation of insured vessels. (N.Y.[2] Cmplt. ¶ 20; Naughton Aff., Ex. A (Apr. 1, 2011 Tsimis Aff.) at ¶ 2). The Association is incorporated under New York law and has its principal place of business in New York, New York. (N.Y. Cmplt. ¶¶ 4-5; Maine[3] Am. Cmplt. ¶ 2)

Non-party Atlantic is a Delaware limited liability company. (N.Y. Cmplt. ¶ 6; Maine Am. Cmplt. ¶ 3) It is now defunct. The company had an office in Maine but was not registered with the Maine Secretary of State to do business in that state. (Maine Am. Cmplt. ¶ 3; Naughton Aff. ¶ 4 & Ex. B; Stevens Aff., Ex. C)

Atlantic was a member of the Association and obtained insurance for the vessel "American Freedom" for the 2006-07 and the 2007-08 policy years.[4] (Naughton Aff., Exs. C, D) At the beginning of each policy year, the Association issued a Certificate of Entry to Atlantic, stating that coverage for the American Freedom was subject to the Association's By-Laws and Rules. (Id.) Those By-Laws and Rules state that "any contract of insurance between the Association and a Member shall be governed by and construed in accordance with the law of the State of New York." (Naughton Aff., Ex. G at ¶ 47)

---

[1] The following facts are taken from the parties' pleadings and other submissions and are uncontroverted unless otherwise indicated.
[2] "N.Y." citations refer to documents filed in 10 Civ. 8033 (PGG).
[3] "Maine" citations refer to documents filed in 11 Civ. 3869 (PGG).
[4] The period for the 2006 policy was March 14, 2006 through February 20, 2007. (Naughton Aff., Ex. C at AC00023) The period for the 2007 policy was February 20, 2007 through February 20, 2008. (Naughton Aff., Ex. D at 1)

2

All communications concerning Atlantic's Association insurance coverage were conducted by Association representatives in Manhattan and Atlantic's insurance brokers, Arthur J. Gallagher (UK) Ltd. in London, and North Star Insurance Services, LLC in Seattle, Washington. (Apr. 1, 2011 Tsimis Aff. ¶ 15) The Association did not solicit Atlantic's business in Maine. (Id. ¶ 16) Instead, Atlantic's insurance brokers contacted the Association about obtaining insurance for Atlantic. (Id.)

When the Certificate of Entry for the 2006-07 policy year was issued on June 14, 2006, the American Freedom was being refitted at a shipyard in Norway for delivery in Maine. (Naughton Aff., Ex. C at AC00025) A Certificate of Documentation issued by the National Vessel Documentation Center on October 4, 2006 lists the ship's hailing port as Portland, Maine. (Stevens Aff., Ex. C) The ship became operational on January 3, 2007. (Naughton Aff., Ex. C at AC00058) During the 2007-08 policy year, the ship had insurance coverage for travel "to the waters and tributaries of the Atlantic Ocean not north of the US/Canada border and not South of the South Carolina/Georgia border, [and] not more than 250 miles offshore." (Naughton Aff., Ex. D at 2)

Henderson is a resident of Wyoming. (Maine Am. Cmplt. ¶ 1; N.Y. Cmplt. ¶ 11) He was employed by Atlantic as a crew member on the American Freedom for two voyages. In connection with the first trip, Atlantic flew him to Norway and he accompanied the vessel on its maiden voyage from Norway to its home port of Portland, Maine. (Naughton Aff., Ex. E (Henderson Aff.) at ¶ 6) The second voyage began off the coast of Massachusetts. (Id.) On February 23, 2007, during the ship's second voyage, Henderson was seriously injured. (N.Y. Cmplt. ¶ 12; Maine Am. Cmplt. ¶ 7; Henderson Aff. ¶ 8) According to the Master's/Supervisor's Report of Injury/Illness, the incident occurred while the ship was off the

3

coast of Long Island, New York. (Apr. 1, 2011 Tsimis Aff. ¶ 18 & Ex. C) Henderson disputes the exact location indicated in the Report, but he does not dispute that he was taken to Southhampton Hospital on Long Island after the incident. (Henderson Aff. ¶¶ 8-9)

## II.     PROCEDURAL BACKGROUND

In February 2010, Henderson commenced a personal injury action against Atlantic in the United States District Court for the District of Maine. (See Maine Am. Cmplt. ¶ 8) Atlantic defaulted, and on April 22, 2011, Henderson obtained a default judgment in the amount of $415,570.19. (Id. ¶ 9; Naughton Aff., Ex. F)

On October 21, 2010, while Henderson's personal injury action was pending in Maine, the Association commenced a declaratory judgment action in this Court against Atlantic and Henderson seeking a declaration prohibiting Henderson from enforcing against the Association any judgment he obtained against Atlantic in the District of Maine. (N.Y. Cmplt. at 9-10) On February 8, 2011, this Court issued a default judgment against Atlantic declaring, inter alia, "that the [the Association] shall have no obligation to provide insurance coverage for any claims asserted by Mr. Henderson in the Maine Action and/or arising out of the February 23, 2007 incident." (N.Y. Dkt. No. 8 at 2)

On December 10, 2010, Henderson commenced a declaratory judgment action in Maine state court, seeking a declaration that the Association is obligated to pay any judgment he obtained against Atlantic. (See Maine Dkt. No. 1, Ex. 3) The Association removed Henderson's action to the District of Maine (Maine Dkt. No. 1), and then moved to dismiss or transfer the action to this District. (Maine Dkt. No. 13) The District of Maine granted the Association's motion to transfer, finding that the factors listed in 28 U.S.C. § 1404(a) favored transfer because neither party had any presence in Maine, the injury did not occur there, there were no witnesses

4

or documents there, and Henderson's choice of forum was not dispositive given that both sides had engaged in a "race to the courthouse." (Maine Dkt. No. 34)

On March 15, 2012, with the consent of the parties, this Court consolidated the two declaratory judgment actions.[5] (N.Y. Dkt. No. 38; Maine Dkt. No. 42) The Court also ordered the parties to submit briefing concerning choice of law. (Id.) On April 30, 2012, the Association filed a motion seeking an order declaring that New York law applies. (N.Y. Dkt. No. 41-43; Maine Dkt. Nos. 45-47) New York law prohibits direct action suits against maritime insurers by judgment creditors such as Henderson.[6] On May 30, 2012, Henderson filed opposition papers, arguing for the application of Maine law, which does not categorically prohibit such suits.[7] (Maine Dkt. Nos. 48-49) On June 14, 2012, the Association filed a reply brief. (N.Y. Dkt. No. 44; Maine Dkt. No. 50) It is undisputed that if New York law applies, the Association will prevail in these actions. (Mar. 12, 2012 Conf. Tr. 6:3-4 (Graydon G. Stevens, counsel for Henderson: "[I]f New York substantive law applies, we cannot win. I concede that."))

## DISCUSSION

Pursuant to 28 U.S.C. § 1333, federal district courts have original jurisdiction over "any case of admiralty or maritime jurisdiction." 28 U.S.C. § 1333(1). "It is well-settled

---

[5] After Henderson's declaratory judgment action was transferred to this Court, he moved to dismiss the Association's declaratory judgment action for lack of personal jurisdiction. (N.Y. Dkt. No. 27) Henderson later withdrew that motion. (Mar. 15, 2012 Order, N.Y. Dkt. No. 38)
[6] N.Y. Ins. Law § 3420(i); Miller v. Am. S.S. Owners Mut. Prot. & Indem. Co., 509 F. Supp. 1047, 1049 (S.D.N.Y. 1981) ("New York law provides for a direct action against insurers on both liability and indemnity policies, but no direct action [by a judgment creditor] is allowed on any marine insurance policy, whether it is one of liability or indemnity.").
[7] 24-A M.R.S.A. §§ 2903-04; Sparkowich v. Am. S.S. Owner's Mut. Prot. & Indem. Ass'n, Inc., 687 F. Supp. 695, 696 n.1 (D. Me. 1988) ("[Maine's] 'Reach and Apply' statute permits a judgment creditor under certain circumstances to proceed directly against a judgment debtor's insurer.").

that federal admiralty jurisdiction over maritime contracts extends to suits involving marine insurance policies." Atlantic Mutual Ins. Co. v. Balfour Maclaine Int'l Ltd., 968 F.2d 196, 199 (2d Cir. 1992); Advani Enters., Inc. v. Underwriters at Lloyds, 140 F.3d 157, 161 (2d Cir. 1998) (same). This rule applies to disputes such as this, in which a judgment creditor seeks satisfaction from a marine indemnity insurer for a judgment against an insured entity. See State Trading Corp. of India, Ltd. v. Assuranceforeningen Skuld, 921 F.2d 409, 414-15 (2d Cir. 1990). Indeed, both parties invoked admiralty jurisdiction in their complaints. (N.Y. Cmplt. ¶ 1; Maine Cmplt. ¶ 1[8]) Accordingly, the consolidated actions arise under this Court's admiralty jurisdiction.

"A federal court sitting in admiralty must apply federal choice of law rules."[9] State Trading Corp., 921 F.2d at 414; see also Commercial Union Ins. Co. v. Flagship Marine Servs., Inc., 190 F.3d 26, 30 (2d Cir. 1999) ("Absent a specific federal rule, federal courts look to state law for principles governing maritime insurance policies, and apply federal maritime choice of law rules to determine which state's law to apply.") (internal citations omitted). Those rules are based on the "principle of resolving conflicts 'by ascertaining and valuing points of

---

[8] Henderson's Amended Complaint does not include a statement of jurisdiction. (See Maine Dkt. No. 35) Fed. R. Civ. P. 9 specifies, however, that "[a] claim cognizable only in the admiralty or maritime jurisdiction is an admiralty or maritime claim for those purposes, whether or not so designated." Fed. R. Civ. P. 9(h)(1). As explained above, this dispute indisputably falls within the Court's admiralty jurisdiction, and therefore it is of no consequence that Henderson's Amended Complaint does not specify that his cause of action is one of admiralty.

[9] Henderson contends that "[t]he sole basis for the removal of Henderson's state court action to federal court was diversity of citizenship [and t]hus, the federal court's jurisdiction in [the Maine action] is based on diversity." (Henderson Br. 21) Even if removal of the Maine action was based on diversity jurisdiction, however, admiralty choice-of-law rules apply. See Melgares v. Sikorsky Aircraft Corp., 613 F. Supp. 2d 231, 250-51 (D. Conn. 2009) (applying federal admiralty choice-of-law analysis to determine law applicable to admiralty claim brought under diversity jurisdiction) (citing Preston v. Frantz, 11 F.3d 357, 359 (2d Cir. 1993) ("When . . . plaintiffs bring a suit based upon diversity jurisdiction, [courts must] nevertheless apply substantive federal maritime law if [they] have admiralty jurisdiction.")); Pisacane v. Italia Societa Per Azioni Di Navigazione, 219 F. Supp. 424, 425 (S.D.N.Y. 1963) ("The complaint in this diversity action states a claim sounding in maritime tort. It is clear therefore that federal maritime choice of law rules must be used to determine the applicable law.").

contact between the transaction and the states . . . whose competing laws are involved.'" State Trading Corp., 921 F.2d at 417 (quoting Lauritzen v. Larsen, 345 U.S. 571, 582 (1953)). Factors for consideration include:

> (1) any choice-of-law provision contained in the [insurance] contract; (2) the place where the contract was negotiated, issued, and signed; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation, and place of business of the parties.

Advani, 140 F.3d at 162; see also Hartford Fire Ins. Co. v. Mitlof, 193 F.R.D. 154, 157 (S.D.N.Y. 2000) (applying Advani factors to determine choice-of-law governing non-party's motion to intervene in marine insurer's declaratory judgment action against insured); State Trading Corp., 921 F.2d at 416-17 (listing similar factors for consideration in judgment creditor's suit against marine insurer). Here, these factors weigh in favor of applying New York law.

First, the insurance contract underlying the parties' dispute incorporates by reference the Association's By-Laws and Rules. (Naughton Aff., Ex. D) The By-Laws and Rules, in turn, specify that "any contract of insurance between the Association and a Member shall be governed by and construed in accordance with the law of the State of New York." (Naughton Aff., Ex. G at ¶ 47) Under federal choice of law rules, a choice-of-law clause in a marine insurance contract governs "unless (1) that jurisdiction has no substantial relationship to the parties or the transaction or (2) that jurisdiction's law conflicts with the fundamental purposes of maritime law." Farrell Lines Inc. v. Columbus Cello-Poly Corp., 32 F. Supp. 2d 118, 127 (S.D.N.Y. 1997).

Neither of these exceptions applies here. As explained below, New York has a substantial relationship to the Association and the insurance contract it issued covering the vessel

on which Henderson was injured.  In addition, New York law, which prohibits direct action suits by judgment creditors against marine insurers, does not conflict with federal admiralty law, which "neither authorizes nor forecloses a third party's right to directly sue an insurance company."  State Trading Corp., 921 F.2d at 414; see also Miller, 509 F. Supp. at 1050 ("[N]o Act of Congress exists that could be read to require direct actions against insurers in all seaman injury cases, or in cases brought in jurisdictions with direct action statutes that except marine insurance.  Nor has any such rule been judicially created.") (citing Wilburn Boat Co. v. Fireman's Fund Ins. Co., 348 U.S. 310, 314 (1955)).  Accordingly, the insurance contract's choice-of-law provision should be honored.

Henderson argues that the insurance contract's choice-of-law provision has no bearing on the choice-of-law analysis because – as a non-party to that contract – it is not binding on him.  (Henderson Br. 23)  However, "a party which is a non-signatory to a contract, but which nonetheless receives a direct benefit from that contract, is estopped from seeking exclusion from provisions of the contract."  Am. S.S. Owners Mut. Prot. & Indem. Ass'n, Inc. v. Am. Boat Co., LLC, No. 11 Civ. 6804(PAE), 2012 WL 527209, at *4 (S.D.N.Y. Feb. 17, 2012).  Under this "direct benefits theory of estoppel," a non-signatory who claims entitlement to payment based on the contractual obligations of a signatory is seeking a benefit under the contract.  See id.

Here, the relief Henderson seeks – payment of his judgment against Atlantic by the Association – is a benefit that depends on the existence of the insurance contract.  Under these circumstances, Henderson is estopped from arguing that the choice-of-law provision in that contract does not apply to him.  See Am. Bureau of Shipping v. Tencara Shipyard S.P.A., 170 F.3d 349, 353 (2d Cir. 1999) (holding that arbitration clause in contract applied to non-signatory yacht owners who received a direct benefit from that contract, without which the benefit "would

8

have been practically impossible"); Am. S.S. Owners, 2012 WL 527209, at *5 (holding that insurance contract's forum selection clause governed because "insurer-insured relationship . . . open[ed] the door for [the non-signatory] to assert entitlement" to benefits); Farrell Lines Inc., 32 F. Supp. 2d at 126 (by filing suit under bill of lading, which is a maritime contract, non-signatory defendant accepted its terms).[10]

Turning to the second factor, "the insurance contract was negotiated, issued, and signed in New York and places other than Maine." (Ass'n. Br. 10; Apr. 1, 2011 Tsimis Aff. ¶¶ 15-16) Henderson does not dispute that this factor favors the application of New York law. (Henderson Br. 23)

The third factor – the place of performance of the insurance contract – turns on where premium bills are sent and where a claim on the policy is made.[11] Fed. Ins. Co. v. PGG

---

[10] Oppenheimer & Co. Inc. v. Deutsche Bank AG, No. 09 Civ. 8154(LAP), 2010 WL 743915 (S.D.N.Y. Mar. 2, 2010) and Thomson-CSF, S.A. v. Am. Arbitration Ass'n, 64 F.3d 773, 780 (2d Cir. 1995), cited by Henderson (Henderson Br. 8-9), are inapposite. In Oppenheimer, the court declined to enforce an arbitration clause against non-signatory Deutsche Bank because the bank had received no direct benefit from the underlying agreement. Oppenheimer, 2010 WL 743915, at *3-4. Similarly, in Thomson-CSF, a company that manufactured flight simulators entered into a contract with a supplier of imaging equipment in which the supplier agreed to sell its equipment only to that company. A competitor subsequently purchased the company. Thomson-CSF, 64 F.3d at 775. The supplier brought an arbitration claim against the competitor when it became clear that the competitor had bought the company for the purpose of eliminating competition, and that the competitor did not intend to purchase imaging equipment from the supplier. Id. at 779. The court held that the supplier could not enforce the arbitration clause against the non-signatory competitor, noting that the non-signatory had not sought to benefit from the supply contract by, for example, purchasing supplies from the supplier or seeking to enforce the contract's exclusivity clause. Accordingly, the arbitration clause could not be enforced against the non-signatory. Id.

This case is entirely different from Oppenheimer and Thomson-CSF because – in seeking to require the Association to pay a judgment against Atlantic based on the Association's agreement to indemnify Atlantic under the insurance contract – Henderson is seeking a direct benefit under the insurance contract.

[11] The Association argues that the insurance contract was performed in New York, because the Association "billed and collected its premiums in New York, and [Atlantic] paid its premiums in

9

Realty, LLC, No. 06 Civ. 2455(JSR), 2007 WL 1149245, at *10 (S.D.N.Y. Apr. 17, 2007), aff'd sub nom. Fed. Ins. Co. v. Keybank Nat'l Ass'n, 340 F. App'x. 5, 8 (2d Cir. 2009) (summary order) (marine insurance "contract was performed – that is, the premiums were billed and a claim on the policy was made – in New York"); St. Paul Fire & Marine Ins. Co. v. Novus Intern., Inc., 09 Cv. 01108(BSJ)(THK), 2011 WL 6937593, at *5 (S.D.N.Y. Dec. 28, 2011). The record is not clear as to whether the Association sent premium bills to Atlantic at its Maine office, or to Atlantic's insurance brokers in London and Seattle. The record is likewise not clear as to where a claim on the policy was first made. Accordingly, this factor is neutral.

The fourth factor looks to the location of the subject matter of the contract, here the insured vessel. Henderson contends that "[t]his factor heavily favors Maine" because "the vessel's home port was in Maine."[12] (Henderson Br. 24) While a vessel's home port is relevant, where "the [insurance] contract does not require the boat to remain moored in [one location], this factor is of diminished importance." Fed. Ins. Co., 2007 WL 1149245, at *10-11 (concluding that New York law applied even though vessel was "typically moored" in Florida; insurance contract did not require ship to remain in Florida); Thomas v. NASL Corp., No. 99 Civ. 11901 (JGK), 2000 WL 1725011, at *8 (S.D.N.Y. Dec. 20, 2000) ("The fourth factor, location of subject matter, is indeterminate because the subject of the contract is marine cargo that travels

---

New York via its London- and Seattle-based brokers." (Ass'n. Br. 11) The cases on which the Association relies, however, look to where the premium bills were sent, rather than where the bills were paid. See Fed. Ins. Co., 2007 WL 1149245, at *10 ("the premiums were billed to [the insured] in New York"); St. Paul, 2011 WL 6937593, at *5 ("the premiums were billed in Missouri [where headquarters of insured was located]")

[12] Henderson also argues that this Court should consider the fact that Atlantic's "sole place of business was in Maine" and that Atlantic "required its crew members to sue in Maine." (Henderson Br. 24) These matters are not relevant to the fourth factor in the choice of law test, however, because that inquiry turns on the location of the insured vessel. See Fed. Ins. Co., 2007 WL 1149245, at *10 (considering location of insured vessel at fourth step of choice-of-law analysis); Hartford, 193 F.R.D. at 157 (same).

throughout the world."); cf. Hartford, 193 F.R.D. at 157 (holding that New York law applied in part because ship was located in New York and insured only for travel on the Hudson River). Here, the American Freedom was insured for travel along the eastern coast of the United States from the Canadian border to the South Carolina/Georgia border. (Naughton Aff., Ex. D at 2) Indeed, at the time of Henderson's injury, the vessel was located off the coast of Long Island, New York. (Apr. 1, 2011 Tsimis Aff. ¶ 18 & Ex. C; see Henderson Aff. ¶¶ 8-9) Accordingly, the fact that the vessel's home port was in Maine does not require the application of Maine law.

Finally, the locus of the parties favors application of New York rather than Maine law. The Association is incorporated under New York law and has its principal place of business in Manhattan. (N.Y. Cmplt. ¶ 5) Henderson is a resident of Wyoming. (Maine Am. Cmplt. ¶ 1; N.Y. Cmplt. ¶ 11) Although Atlantic had an office in Maine, it was not registered to do business there, it was incorporated in Delaware, and it relied on London and Seattle brokers to manage its relationship with the Association. (N.Y. Cmplt. ¶ 6; Maine Am. Cmplt. ¶ 3; Naughton Aff. ¶ 4 & Ex. B; Stevens Aff., Ex. C; Apr. 1, 2012 Tsimis Aff. ¶¶ 15, 16) See Advani, 140 F.3d at 163 ("Advani's office in New York, albeit important, carries less weight because the record does not show that Advani's principal place of business or state of incorporation is New York."); St. Paul, 2011 WL 6937593, at *5 ("Although Novus itself is located in Missouri, it relied entirely on its New York insurance broker, Marsh, to manage its relationship with St. Paul.") Accordingly, the location of the parties favors the application of New York over Maine law. (See also Maine Dkt. No. 34 (transferring Henderson's action to this District in part because neither party has presence in Maine))

In sum, analysis of the choice-of-law factors indicates that the Court should apply New York law. The fact that the premium bills might have been sent to Maine, where Atlantic

11

had an office and where the American Freedom was sometimes docked, does not outweigh the more substantial connections between the underlying insurance contract and New York.

## **CONCLUSION**

For the reasons stated above, the Association's motion for an order declaring that New York law governs these consolidated actions is GRANTED. The Clerk of the Court is directed to terminate the motion (10 Civ. 8033, Dkt. No. 41; 11 Civ. 3869 Dkt. No. 45).

Dated: New York, New York
       March 26, 2013

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge